**UNITED STATES of America,**
**Plaintiff-Appellant,**

v.

**PROFESSIONAL AIR TRAFFIC CONTROLLERS ORGANIZATION (PATCO); Professional Air Traffic Controllers Organization, O'Hare Local # 316 (Patco O'Hare); The Officers, Agents, Directors, Managers, Servants and Members of Both Patco and Patco O'Hare; John M. Paolino, Richard L. Scholz, Tom Brockett, John Doe and Richard Roe, Defendants-Appellees.**

No. 80–2854.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 25, 1981.

Decided June 18, 1981.

As Corrected June 18, 1981.

Crabb, Chief Judge, sitting by designation, concurred and filed opinion.

Linda A. Wawzenski, Frederick H. Branding, Asst. U. S. Attys., Chicago, Ill., for plaintiff-appellant.

Richard J. Leighton, Washington, D. C., for defendants-appellees.

Before SWYGERT and BAUER, Circuit Judges, and CRABB, District Judge.*

* The Honorable Barbara B. Crabb, United States District Judge for the Western District of Wisconsin, is sitting by designation.

SWYGERT, Circuit Judge.

The issues presented in this case are (1) whether Title VII of the Civil Service Reform Act, 5 U.S.C. §§ 7101–35, covering federal labor-management relations, preempts the jurisdiction of district courts under 5 U.S.C. § 7311, which prohibits strikes by employees of the Government of the United States, and (2) if there is no preemption, whether strike activity by such employees can be enjoined under section 7311. We hold that there is no preemption and that injunctions under section 7311 are within the jurisdiction of the federal courts. Accordingly, we reverse the order of the district court dismissing the action for lack of jurisdiction. 504 F.Supp. 432.

**I**

On July 30, 1980, Richard L. Scholz, the president of Professional Air Traffic Controllers Organization, O'Hare Local No. 316 (PATCO) wrote the Federal Aviation Administration (FAA), demanding that the FAA take immediate action to upgrade the O'Hare Tower to a Level 5 facility[1] and provide a tax-free bonus of $7,500.00 to each controller. Scholz stated that the two demands were non-negotiable and gave the FAA ten days in which to grant the demands or prove that they would be implemented. Scholz threatened that

> Failure to meet these two demands will result in the controllers at O'Hare ATCT (Air Traffic Control Tower) withdrawing their enthusiasm.

Upon receipt of union demands on August 5, 1980, the Regional Administrator asked for two weeks to respond and reminded PATCO of its statutory obligation not to strike. He also stated that the FAA considered Scholz's letter a threat of an illegal job action.

A slowdown of traffic at O'Hare Airport began on August 6. It culminated on Friday, August 15, 1980, when more than six hundred commercial and private planes in and around O'Hare experienced delays of more than thirty minutes during a 21-hour period from 12:01 a. m. to 9:00 p. m. inclusive.[2]

The intensified slowdown on August 15 paralyzed airport traffic. On Sunday, August 17, 1980, the United States petitioned the district court *ex parte* for a temporary restraining order; later that day, Judge Nicholas J. Bua, acting as an emergency judge, entered a temporary restraining order enjoining the "slowdown." On August 18, the United States instituted this action for a preliminary injunction against the local union, its parent, and the officers and agents of both organizations. Expedited discovery was pursued by the parties. On October 20, 1980, the defendants filed a motion to dismiss the suit against them for lack of subject matter jurisdiction. On December 15, 1980, the district court granted the motion, basing its dismissal on three grounds: (1) Title VII of the Civil Service Reform Act of 1978 vests exclusive jurisdiction over strike activities by federal employees in the Federal Labor Relations Authority; (2) 5 U.S.C. § 7311 does not authorize injunctive relief; and (3) injunctive relief will not be granted against the commission of a crime. This appeal followed.[3]

**II**

**A. Pre-Title VII Law**

Prior to the enactment of Title VII of the Civil Service Reform Act of 1978, federal labor-management relations were regulated

---

**1.** Air Traffic Control Towers throughout the nation are categorized on a scale of 1 to 4 based on the quantity and complexity of traffic handled. No tower bears a Level 5 designation nor does such a designation exist for control towers.

**2.** Some of these delays lasted as long as three hours. Numerous planes were diverted to other airports and many flights were cancelled.

**3.** On June 9, 1981, the Government filed a motion for an expedited ruling, alleging that defendants have threatened to strike on June 22, 1981. The Government requests a decision in this case on or before June 19, 1981. This motion is rendered moot by our opinion filed today.

by Executive Order 11491, as amended.[4] Section 19(b)(4) of the order made it an unfair labor practice for a labor organization to "call or engage in a strike, work stoppage, or slowdown . . . or condone any such activity by failing to take affirmative action to prevent or stop it." Section 4(c)(4) of the Executive Order authorized the Federal Labor Relations Authority to decide unfair labor practice complaints.

The courts that considered the scope of the district court's jurisdiction over actions to enforce the Executive Order held that there was no subject matter jurisdiction because an executive order was not a law of the United States within the meaning of 28 U.S.C. § 1331. *See Stevens v. Carey*, 483 F.2d 188, 190 (7th Cir. 1973); *Kuhn v. National Ass'n of Letter Carriers*, 570 F.2d 757, 760–61 (8th Cir. 1978); *Local 1498, American Federation of Government Employees v. American Federation of Government Employees*, 522 F.2d 486, 491 (3d Cir. 1975).[5] District courts did, however, enjoin strikes by federal employees by invoking the general grant of jurisdiction in 28 U.S.C. § 1345[6] to enforce the anti-strike provision of 5 U.S.C. § 7311 and 18 U.S.C. § 1918.[7] *Air Transport Ass'n v. PATCO*, 313 F.Supp. 181 (E.D.N.Y.), *vacated in part on other grounds*, 438 F.2d 79 (2d Cir. 1970), *cert. denied*, 402 U.S. 915, 91 S.Ct. 1373, 28 L.Ed.2d 661 (1971); *United States v. Branch 60, National Ass'n of Letter Carriers*, 312 F.Supp. 619 (D.Conn.1970); *Tennessee Valley Authority v. Local 110, Sheet Metal Workers' Int'l Ass'n*, 233 F.Supp. 997 (W.D.Ky.1962). The district courts in those cases did not discuss the jurisdictional question; rather, they assumed that they had jurisdiction to enjoin strikes by federal employees.

**B. Purpose and Structure of Title VII**

Title VII of the Civil Service Reform Act of 1978 was enacted to provide a comprehensive statutory scheme for the regulation of federal labor-management relations. The statute created a new, independent agency, the Federal Labor Relations Authority (FLRA), 5 U.S.C. § 7104 (Supp. III 1979), which was to be primarily responsible for carrying out the purposes of Title VII, 5 U.S.C. § 7105(a)(1) (Supp. III 1979). Congress adopted almost verbatim the language of section 19(b)(4) of the Executive Order, making it an unfair labor practice for a union to call, participate in, or condone a strike or slowdown. 5 U.S.C. § 7116(b)(7) (Supp. III 1979).

The statute set out administrative procedures to enforce the unfair labor practice provisions. Section 7118(a) provides that upon receipt of an unfair labor practice charge, the General Counsel of the FLRA

---

**4.** Exec. Order 11491, 3 C.F.R. 861 (1966–1970 Compilation), *as amended* by Exec. Order 11616, 3 C.F.R. 605 (1971–1975 Compilation); Exec. Order 11636, 3 C.F.R. 634 (1971–1975 Compilation); Exec. Order 11838, 3 C.F.R. 957 (1971–1975 Compilation); Exec. Order 11901, 3 C.F.R. 87 (1976 Compilation); Exec. Order 12027, 3 C.F.R. 159 (1977 Compilation); Exec. Order 12107, 44 Fed.Reg. 1055 (1979); Exec. Order 12126, 44 Fed.Reg. 18923 (1979).

**5.** District courts did have jurisdiction under the Executive Order in cases involving allegations that the federal agency violated constitutional rights. *See National Ass'n of Government Employees v. White*, 418 F.2d 1126, 1129–30 (D.C. Cir.1969).

**6.** 28 U.S.C. § 1345 provides:
Except as otherwise provided by Act of Congress, the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress.

**7.** 5 U.S.C. § 7311 provides in part:
An individual may not accept or hold a position in the Government of the United States . . . if he—

(3) participates in a strike, or asserts the right to strike, against the Government of the United States . . .; or
(4) is a member of an organization of employees of the Government of the United States . . . that he knows, asserts the right to strike against the Government of the United States . . . .
18 U.S.C. § 1918 contains criminal penalties for the violation of 5 U.S.C. § 7311:
Whoever violates the provision of section 7311 of title 5 . . . shall be fined not more than $1,000 or imprisoned not more than one year and a day, or both.

shall investigate the charge and then decide whether or not to issue a complaint.[8] After a hearing on the complaint and the issuance of written findings of fact, the FLRA is authorized to issue a cease and desist order against any unfair labor practice. 5 U.S.C. § 7118(a)(7) (Supp. III 1979). Section 7123 provides for judicial review of final orders of the FLRA by the federal court of appeals, and for enforcement of FLRA orders by the district courts.

The statute also authorizes the FLRA to petition a district court for temporary relief, including a temporary restraining order, only after the General Counsel has issued an unfair labor practice complaint. 5 U.S.C. § 7123(d) (Supp. III 1979). According to the district court, these provisions for judicial review, enforcement of FLRA orders, and issuance of temporary relief by a district court upon motion of the FLRA "embrace the only role given the federal courts under the statute." *United States v. PATCO*, No. 80–C–4390, mem. op. at 5 (N.D.Ill. Dec. 15, 1980).

C. Legislative History

■ We note initially that, in interpreting the legislative history of a statute, there is a presumption that Congress was aware of the judicial construction of existing law. *Shapiro v. United States*, 335 U.S. 1, 16, 68 S.Ct. 1375, 1383–1384, 92 L.Ed.2d 1787 (1948). Thus, a newly-enacted statute "is to be read in conjunction with the entire existing body of law." *Kansas City v. Federal Pacific Electric Co.*, 310 F.2d 271, 275 (8th Cir.), *cert. denied*, 371 U.S. 912, 83 S.Ct. 256, 9 L.Ed.2d 171 (1962).

We recognized previously that the administrative jurisdiction provided by Executive Order 11491 coexisted with federal court jurisdiction, which was invoked pursuant to 28 U.S.C. § 1345 to enforce the prohibition of 5 U.S.C. § 7311 and 18 U.S.C. § 1918; as noted at p. 20 *supra,* district courts ex-

ercised this jurisdiction to enjoin strikes. When Congress enacted Title VII, it adopted the language of section 19(b)(4) of the Executive Order in section 7116(b)(7), making it an unfair labor practice for a union "to call, or participate in, a strike, work stoppage, or slowdown." Because we presume that Congress knew of the district court jurisdiction invoked concurrently with the administrative provisions of the Executive Order, we must conclude that when Congress codified without change this provision of the Executive Order, it did not intend to preempt the existing concurrent jurisdiction of the federal courts.

■ We find additional support for our conclusion in both the language of the statute itself and the congressional debates prior to its enactment. Section 7101(b) of the Civil Service Reform Act of 1978 provides that "[t]he provisions of this chapter should be interpreted in a manner consistent with the requirement of an effective and efficient Government." Before the FLRA can seek temporary relief in a district court, it must (1) have an unfair labor practice charge pending before it; (2) investigate that charge; (3) make a finding of probable cause; and (4) issue an unfair labor practice complaint. 5 U.S.C. §§ 7118(a), 7123(d). While the Government is waiting for the FLRA to follow this procedure, the employees could be out on strike. Such a result is not consistent with the goal of "an effective and efficient Government." The reason for Congress's prohibition of strikes by federal employees was reiterated during the congressional debates on Title VII:

The primary reason for Government services is to supply the public with certain essentials of life which cannot reasonably be supplied by the average citizen himself, or to him by private enterprise.... Because these services are essential to the health, welfare and safety

8. According to the Report of the House Committee on Post Office and Civil Service, H.R. Rep.No.95–1403, 95th Cong., 2d Sess. 52 (1978), *reprinted in* Legislative History of the Federal Service Labor-Management Relations Statute, Title VII of the Civil Service Reform Act of 1978, 96th Cong., 1st Sess. 698 (1979) (Comm. Print. No. 96–7) [hereinafter cited as Leg.Hist.]. "[t]he General Counsel's decision as to whether a complaint should issue shall not be subject to review."

of the public, ... it becomes intolerable that they be interrupted.

124 Cong.Rec. H 9651 (daily ed. Sept. 13, 1978) (remarks of Rep. Rousselot), *reprinted in* Leg.Hist., *supra*, at 959. *See also* 124 Cong.Rec. H 9868 (daily ed. Sept. 13, 1978) (remarks of Rep. Rudd) ("Some of these services are so critical that their disruption threatens the public well-being"), *reprinted in* Leg.Hist., *supra*, at 964.

The question of preemption was raised by Representative Erlenborn during the congressional debates. The following colloquy took place:

Mr. Erlenborn: ... [A]t the present time it is illegal, not just an unfair labor practice, an illegal strike by Federal employees, supported by their union will lead to the union no longer being allowed to be the exclusive bargaining agent. Now that will be changed, in substance, by this title VII.

Mr. Glickman: ... [P]articipating in or calling an illegal strike, being in violation of any other Federal laws, or perhaps other criminal laws—or does this section supersede anything like that? What I am trying to figure out, does this apply only to an unfair strike, or do other applications of the Federal law still prohibit the strike?

Mr. Erlenborn: So far as I know this will be the only remedy, the unfair labor practice charge ....

Mr. Ford: ... That statute is not affected by this law at all, or by this bill, rather, so the act of striking will continue to be a violation of Federal law.

The difference is that this bill for the first time will add on top of that a specific procedure available to the Government to go after a labor organization which advocates strike activity by making that an unfair labor practice reachable in the same way that any other unfair labor practice committed by the union or its representatives is reached by the statute, so that, in fact, we did not affect the existing law on strikes. We add a remedy for the Government in the case of someone advocating an illegal strike ....

Mr. Erlenborn: Mr. Chairman, let me understand this. Is the gentleman suggesting that this bill, being a later enactment, would not be considered to be a repeal of the current law ...?

Mr. Ford: ... [T]itle 18 of the United States Code 1918 provides criminal penalties against strikes in violation of 5 United States Code. Five United States Code prohibits the strike, Title 18 makes participating in the illegal strike a crime.

*Neither of those titles is affected by any of the provisions in this act.*

124 Cong.Rec. H 9454–55 (daily ed. Sept. 11, 1978), *reprinted in* Leg.Hist., *supra*, at 880–81 (emphasis added). These statements make it clear that Congress in enacting Title VII did not intend to preempt existing remedies for strikes by federal employees.

### D. Analogy to the NLRA

The district court relied on an analogy to the National Labor Relations Act (NLRA) to support its holding that the FLRA has exclusive jurisdiction over this case. The district court recognized that Congress intended the authority of the FLRA to parallel that of the NLRB. *See* H.R.Rep.No.95–1403, 95th Cong., 2d Sess. 41 (1978), *reprinted in* Leg.Hist., *supra*, at 687.

Although we agree with the statement that Congress intended the FLRA to parallel the NLRB in many respects, Congress nevertheless recognized that there are important differences between labor relations in the private and public sectors, and that these differences compel different treatment of the two groups. First, Congress, by exempting federal employees from the NLRA and enacting Title VII, indicated that it intended private and public employees to be treated differently under the law. The legislators discussed the necessity for different treatment during the debate over Title VII. *See* 124 Cong.Rec. S 14281 (daily ed. Aug. 24, 1978) (remarks of Sen. Sasser) ("the Federal labor relations program continues to differ in substantive ways from that of the private sector. For one, Federal employees are not allowed to strike."), *reprinted in* Leg.Hist., *supra*, at 1014; 124

Cong.Rec. H 8466 (daily ed. Aug. 11, 1978) (remarks of Rep. Clay) ("there are nevertheless differences between the public and the private sector"), *reprinted in* Leg.Hist., *supra*, at 853; 124 Cong.Rec. H 9640 (daily ed. Sept. 13, 1978) (remarks of Rep. Rudd) ("It has long been recognized that public employment is quite different than private sector employment. These differences are most acute when it comes to labor relations in general, and strikes in particular."), *reprinted in* Leg.Hist., *supra*, at 938. These statements by the legislators support our conclusion that the analogy to the NLRB is only partial.

■ The district court's analysis of the parallel to the NLRB is further undercut by a provision in the National Labor Relations Act that authorizes a district court to enjoin a strike upon a petition of the Attorney General when the strike "will imperil the national health or safety." [9] Congress recognized that in certain critical situations, district courts must have jurisdiction to enjoin threatened or actual strikes immediately, without waiting for the NLRB to act. A similar statutory provision was not necessary in Title VII because district courts had already held that they had jurisdiction to enjoin strikes under 28 U.S.C. § 1345. *See* p. 1137 *supra.*

### E. Post-Title VII Cases

Two courts have considered the scope of the district court's jurisdiction under Title VII, and both courts held that FLRA jurisdiction over unfair labor practices is exclusive. *Clark v. Mark*, No. 79–CV–777 (N.D. N.Y. Aug. 27, 1980); *National Federation of Federal Employees v. Commandant, Defense Language Institute*, 493 F.Supp. 675 (N.D.Cal.1980). Those cases are, however, distinguishable from the case at bar.

Both cases concerned activities that were unfair labor practices only; the work slowdown involved in the instant case is not only an unfair labor practice but is also prohibited by a separate statute, 5 U.S.C. § 7311. Thus, the conclusion that the FLRA has exclusive jurisdiction over unfair labor practices is irrelevant to our holding that the district court has jurisdiction under 28 U.S.C. § 1345 to enforce the prohibition of 5 U.S.C. § 7311.

Finally, as a matter of policy the United States must have the option to seek immediate injunctive relief from the district court to avoid the emergency that a paralyzing strike at O'Hare Airport would likely create. The magnitude of harm to our national economy and to the security of air travelers that a strike might cause are valid reasons for the United States to avoid, if it chooses, seeking temporary relief through the FLRA procedures. Those procedures could be both lengthy and abortive. First, an investigation must be undertaken; upon its completion, the General Counsel must decide whether to issue a complaint against the offending party. Once these steps have been completed, the General Counsel may seek a temporary restraining order in the district court. His decision about whether to go to court is not only unilateral, but, of greater importance, is unreviewable. *See* n.8 *supra*. An intentional slowdown or strike by air traffic controllers at O'Hare Airport is too fraught with dire consequences to the public to confine the United States to the procedures set out in Title VII. Policy considerations dictate that the Government be able to consider whether more prompt relief can be afforded by an alternative procedure.

**9.** 29 U.S.C. § 178(a) provides:

Upon receiving a report from a board of inquiry the President may direct the Attorney General to petition any district court of the United States having jurisdiction of the parties to enjoin such strike or lock-out or the continuing thereof, and if the court finds that such threatened or actual strike or lock-out—

(i) affects an entire industry or a substantial part thereof engaged in trade, commerce, transportation, transmission, or communication among the several States or with foreign nations, or engaged in the production of goods for commerce; and

(ii) if permitted to occur or to continue, will imperil the national health or safety, it shall have jurisdiction to enjoin any such strike or lock-out, or the continuing thereof, and to make such other orders as may be appropriate.

## III

The district judge observed that although the Government characterizes section 7311 as a prohibition against strikes by its employees, the statute "does not literally speak in those terms, but rather in terms of one of the conditions of public employment." *United States v. PATCO*, No. 80–C–4930, mem. op. at 14–15 (Dec. 15, 1980). The judge went on to comment:

> Section 7311 must however be considered in conjunction with 18 U.S.C. § 1918, which makes an individual's violation of its provisions a crime, and 18 U.S.C. § 2(a), which subjects anyone aiding and abetting commission of a federal crime to punishment as a criminal principal. Thus the specific *statutory* consequence of an *individual employee's* strike participation is his or her potential *termination of employment* under Section 7311 and potential *prosecution* under 18 U.S.C. § 1918. As for a *labor organization,* in *statutory* terms its exposure is to potential *prosecution* under 18 U.S.C. § 2(a).[10]

*Id.* at 15 (emphasis in original). This passage suggests that the district court viewed the criminal penalty of 18 U.S.C. § 1918 and the termination of employment implicit in the terms of 5 U.S.C. § 7311 as the exclusive remedies for engaging in the prohibited conduct. We disagree with that conclusion.

"It is a familiar maxim of statutory interpretation that courts should enforce· a statute in such a manner that its overriding purpose will be achieved, even if the words used leave room for a contrary interpretation." *Haberman v. Finch*, 418 F.2d 664, 666 (2d Cir. 1969). *See also Logan Lanes, Inc. v. Brunswick Corp.*, 378 F.2d 212, 216 (9th Cir.), *cert. denied*, 389 U.S. 898, 88 S.Ct. 219, 19 L.Ed.2d 216 (1967). As noted previously, the purpose of the prohibition of 5 U.S.C. § 7311 and 18 U.S.C. § 1918 was to prevent the interruption of critical Government services. *See* pp. 1139–1140 *supra.*

■ In the case at bar, dismissing or indicting the air traffic controllers involved in the slowdown would not be a viable remedy for the Government. First, terminating a substantial number of controllers would seriously impair the FAA's ability to provide the public with this essential service; this is precisely the sort of result that the statutory provisions were intended to prevent. Second, indicting or terminating the controllers after a strike does nothing to prevent the strike and the serious consequences that would surely follow. Thus, the only remedy available to the Government that can prevent a strike is an injunction.

■ Further, a new statutory remedy is not exclusive and common-law rights and remedies survive unless Congress intended the new remedy to be exclusive. *Continental Management, Inc. v. United States*, 527 F.2d 613 (Ct.Cl.1975). *Cf. Federal Marine Terminals, Inc. v. Burnside Shipping Co.*, 394 U.S. 404, 412, 89 S.Ct. 1144, 1149, 22 L.Ed.2d 371 (1969) ("the legislative grant of a new right does not ordinarily cut off or preclude other nonstatutory rights in the absence of clear language to that effect"). At common law, public employees had no right to strike, *United Federation of Postal Clerks v. Blount*, 325 F.Supp. 879, 882 (D.D.C.), *aff'd*, 404 U.S. 802, 92 S.Ct. 80, 30 L.Ed.2d 38 (1971), and the Government had the right to seek injunctive relief in the federal courts, *see United States v. United Mine Workers*, 330 U.S. 258, 278–80, 67 S.Ct. 677, 688–90, 91 L.Ed. 884 (1947). Nothing in the language of either 5 U.S.C. § 7311 or 18 U.S.C. § 1918 indicates that Congress intended the penalties in those provisions to be the only remedies available to the Government in the case of an threatened or actual strike by public employees. Because in the absence of indications to the contrary we presume that Congress did not intend the statutory remedies to be exclusive, and because an injunctive remedy is necessary to effectuate the purpose of those provisions, we conclude that an injunction is an available remedy under section 7311.

---

**10.** 18 U.S.C. § 2(a) provides:

Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

■ That defendants seek to enjoin PAT-CO, the labor organization, poses no obstacle to injunctive relief under section 7311.[11] Although the union cannot be dismissed as an employee can, of course, the union speaks for the individual employees and acts for them as their bargaining agent. Under ordinary principles of agency law, the union may therefore be enjoined as the agent of its members, and is a proper party-defendant.

## IV

At the request of the parties, the district judge clarified his disposition of the case as to the individual defendants in a second opinion dated December 19, 1980. In that opinion, the court discussed the general equitable principle that an injunction will not be granted against the commission of a crime and cited *United States v. Jalas*, 409 F.2d 358, 360 (7th Cir. 1969).

In *Jalas*, the United States sought to enjoin Clarence Jalas from being a candidate for the office of business manager of his local union because of his prior conviction under section 186(b)(1) of the Landrum-Griffin Act, 29 U.S.C. § 186(b)(1). He had received common stock from an employer while serving as his local's business manager, and his conviction for such conduct allegedly disqualified him under section 504(a) of the Act as a candidate for union office.[12] We held that the Government lacked standing to bring the suit. Our opinion concluded:

> Because the case law and statutory language do not compel a contrary conclusion, we hold that the Government has no standing to bring this injunctive action. There is no national emergency which warrants departing from the general rule prohibiting injunctions against the com-

mission of criminal acts. If we were to hold otherwise and enjoin Jalas from holding office, we would necessarily be deciding in the context of a civil action *an important criminal law question* under section 504(a).

*Id.* at 360–61 (emphasis added).

■ That affirmative acts or omissions proscribed by a civil statute are also subject to criminal sanctions does not *ipso facto* convert the civil proscription into criminal activity. Conduct described as illegal can simultaneously be subject to both civil remedies and criminal sanctions. If statutory provisions permit, the Government may pursue either or both avenues for enforcement of the proscribed conduct to effectuate an overriding public policy. *See National Ass'n of Letter Carriers v. Independent Postal System*, 470 F.2d 265, 271 (10th Cir. 1972). To the point is our observation in *United States v. Cappetto*, 502 F.2d 1351, 1357 (7th Cir. 1974), *cert. denied*, 420 U.S. 925, 95 S.Ct. 1121, 43 L.Ed.2d 395 (1975):

> It has thus been settled since the *Debs* decision [158 U.S. 564, 15 S.Ct. 900, 39 L.Ed. 1092 (1895)] that acts which may be prohibited by Congress may be made the subject of both criminal and civil proceedings, and the prosecuting arm of the government may be authorized to elect whether to bring a civil or criminal action, or both. A civil proceeding to enjoin those acts is not rendered criminal in character by the fact that the acts also are punishable as crimes.

■ As in *Jalas*, this case involves a statute that combined civil and criminal provisions. Section 7311 constituted only one-half of Pub.L. No. 330, 84th Cong., 1st Sess.; the other half is now incorporated in the Code at 18 U.S.C. § 1918. The differ-

---

11. The district courts that have issued injunctions under 5 U.S.C. § 7311 and 18 U.S.C. § 1918 have enjoined both the unions and the individual employees. *See* cases cited p. 1137 *supra.*

12. 29 U.S.C. § 504(a) provides in part:
> No person who . . . has been convicted of . . . bribery . . . shall serve—

> (1) as an officer, director . . . business agent . . . or other employee . . . of any labor organization

> .    .    .    .    .

Section 504(b) provides that
> Any person who willfully violates this section shall be fined not more than $10,000 or imprisoned for not more than one year, or both.

ence in emphasis between *Jalas* and this case, however, is significant.[13] In *Jalas*, the impending commission of a crime was the sole basis for the injunctive relief sought. Here, as in *Cappetto*, the injunction is necessary to prevent the potential civil consequences of the prohibited conduct. The principles enunciated in *Jalas* are therefore not a bar to the issuance of an injunction in this case.

For the reasons stated herein, the order of the district court dismissing the action is reversed and the cause is remanded for further proceedings.

CRABB, Chief Judge, concurring.

I concur fully in Judge Swygert's well-reasoned opinion. I write separately only to emphasize what I consider to be a particularly troublesome issue in this case.

Critical to the court's decision is the construction of 5 U.S.C. § 7311; specifically, whether § 7311 can be read, with 28 U.S.C. § 1345, to authorize federal court injunctive relief against strikes or slowdowns by federal employees. By its language, § 7311 states a condition of employment, *i. e.*, that an individual "may not accept or hold a position in the Government of the United States" if he participates in a strike, asserts the right to strike, or is a member of an organization that asserts the right to strike. The statute is silent with respect to any rights the government might have against an individual employee or an organization of employees asserting a right to strike, except for such rights of removal from, or denial of, employment as can be inferred from the terms of the statute.

Notwithstanding this silence, other federal courts have construed the statute in conjunction with the criminal penalties provided in 18 U.S.C. § 1918 and § 2, and have enjoined strikes by federal employees.[1] *Air Transport Ass'n v. PATCO*, 313 F.Supp. 181 (E.D.N.Y.1970); *reversed in part on other grounds*, 438 F.2d 79 (2nd Cir. 1970), *cert. denied*, 402 U.S. 915, 91 S.Ct. 1373, 28 L.Ed.2d 661 (1971); *United States v. Branch 60, National Ass'n of Letter Carriers*, 312 F.Supp. 619 (D.Conn.1970); *Tennessee Valley Authority v. Local 110, Sheet Metal Workers' Int'l Ass'n*, 233 F.Supp. 997 (W.D.Ky.1962). In the absence of any statutory authority other than that provided by § 7311, I have some doubt as to whether a jurisdictional basis existed for these district court injunctions.[2]

However, I believe the question of jurisdiction has been made moot by Congress' implicit approval of the exercise of such jurisdiction concomitant to the enactment of Title VII of the Civil Service Reform Act of 1978. The legislative history of Title VII indicates that Congress understood that the then existing statutes provided that strikes of federal employees were illegal and punishable. Implicit in this understanding was a recognition that district courts have enjoined strikes by federal employees and, *ipso facto*, had the requisite authority to enjoin the strike. *See* 124 Cong.Rec. H 9454–55 (daily ed. Sept. 11, 1978), *reprinted in* Legislative History of the Federal Service Labor-Management Relations Statute, Title VII of the Civil Service Reform Act of 1978, 96th Cong., 1st Sess. 698 (1979) (Comm.Print No. 96–7) [hereafter cited as Leg.Hist.] (colloquy between Reps. Erlenborn, Glickman, and Ford). Most importantly, the legislative history indicates that Congress did not intend to alter either the then existing prohibitions against strikes, or

13. We recognized also in *Jalas* three exceptions to the general rule that courts have no power to enjoin the commission of a crime. 400 F.2d at 360. Only one of those exceptions is applicable here: an "acute national emergency." Even though we find it unnecessary to address the issue directly, we are of the view that had it been fully addressed by the district court, the facts surrounding the slowdown would have warranted the court to have found that a threatened strike or even a continuation of the deliberate slowdown would have created acute national emergency consequences.

1. The general equitable doctrine that injunctive relief will not be granted against the commission of a crime suggests that the injunctive relief was ordered pursuant to 5 U.S.C. § 7311.

2. None of the courts in the cases cited above addressed the issue of subject matter jurisdiction.

the then existing sanctions, including injunctions, prohibiting strikes:

> [The existing prohibition against federal employees striking is] not affected by this law at all, or by this bill; rather, so the act of striking will continue to be a violation of Federal law.
>
> The difference is that this bill for the first time *will add on top of that* a specific procedure available to the Government to go after a labor organization which advocates strike activity by making that an unfair labor practice reachable in the same way that any other unfair labor practice committed by the union or its representatives is reached by the statute, so that, in fact, we did not affect the existing law on strikes. *We add a remedy* for the Government in the case of someone advocating an illegal strike,
> . . . .

124 Cong.Rec. H 9455 (daily ed. Sept. 11, 1978) (remarks of Rep. Ford), *reprinted in* Leg.Hist., *supra*, at 880–81 (emphasis added).

Accordingly, because Congress intended to ratify pre-existing sanctions against strikes by federal employees in enacting Title VII, and because those pre-existing sanctions included injunctions against strikes by federal employees, I join in the court's conclusion that injunctions under 5 U.S.C. § 7311 are within the jurisdiction of the federal courts. I do so cognizant of the countervailing arguments so thoroughly discussed in the district court's opinion. Indeed, the strength of the parties' competing arguments underscores my own belief that this is an instance in which the statutory framework and legislative history provide federal courts with little, if any, guidance. Strikes by federal employees raise any number of important policy questions. Resolution of such questions should result from a full and complete inquiry by Congress, rather than by judicial construction from a shadowy statutory framework.