**STATE OF NEW YORK,**
Plaintiff–Appellee,

v.

**HENDRICKSON BROTHERS, INC., Amfar Asphalt Corp., Francis Ambrosio, Anthony Farino, Jack Farino, and Lizza Industries, Inc., Defendants–Appellants,**

**Pratt & Pratt Inc., James J. Pratt, and Herbert Hochreiter, Defendants.**

Nos. 1086, 1088 and 1089, Dockets 86–9080, 87–7028 and 87–7068.

United States Court of Appeals, Second Circuit.

Argued April 29, 1987.

Final Briefs Submitted Aug. 3, 1987.

Decided Feb. 16, 1988.

Joseph Opper, Asst. Atty. Gen., New York City (Robert Abrams, Atty. Gen. of the State of N.Y., Lloyd Constantine, Chief, Antitrust Bureau, Lawrence S. Kahn, Deputy Sol. Gen., George Sampson, Mark Moskovitz, Asst. Attys. Gen. New York City, on the brief), for plaintiff-appellee.

Milton S. Gould, New York City (Leon D. Lazer, Clifford Thau, David S. Tannenbaum, Shea & Gould, New York City, on the brief), for defendant-appellant Hendrickson Bros., Inc.

Paul F. Corcoran, Mineola, N.Y. (Michael H. Soroka, Speno Goldberg Moore Margules & Corcoran, P.C., Mineola, N.Y., on the brief), for defendants-appellants Amfar Asphalt Corp., Francis Ambrosio, Anthony Farino, and Jack Farino.

Roanne L. Mann, New York City (David N. Ellenhorn, Stein, Zauderer, Ellenhorn, Frischer & Sharp, New York City, on the brief), for defendant-appellant Lizza Industries, Inc.

Before FEINBERG, Chief Judge, KEARSE and WINTER, Circuit Judges.

KEARSE, Circuit Judge:

Defendants-appellants Hendrickson Brothers, Inc. ("Hendrickson"), Amfar Asphalt Corp. ("Amfar"), Francis Ambrosio, Anthony Farino, Jack Farino ("Farino"), and Lizza Industries, Inc. ("Lizza"), appeal from so much of a final judgment entered in the United States District Court for the Eastern District of New York following a jury trial before Jacob Mishler, *Judge,* as awarded plaintiff State of New York ("State") (1) $7,455,000 in treble damages against them for conspiracy to obtain highway construction contracts from the State at prices that were fixed and maintained at artificial and noncompetitive levels in violation of § 1 of the Sherman Act, 15 U.S.C. § 1 (1982); (2) $375,000 in treble damages against Amfar, Ambrosio, Farino, Anthony Farino, and Lizza for conspiracy to fix prices on construction materials contracts awarded by Suffolk County ("County"), in violation of § 1 of the the Sherman Act; and (3) $100 as a civil penalty against each defendant for the above conspiracies in violation of New York's Donnelly Act, N.Y. Gen.Bus.Law §§ 340–347 (McKinney 1968). On appeal, some or all of the appellants contend principally (1) that the district court erred (a) in giving estoppel effect to the mail fraud convictions of certain of the defendants and (b) in admitting certain statements as coconspirator admissions; and (2) that they were entitled to judgment in their favor notwithstanding the verdict ("n.o.v."), or in the alternative a new trial, on the grounds that (a) without the improperly admitted evidence, the proof was insufficient to support a finding of conspiracy, (b) the State's claims were barred by the statute of limitations, and (c) the State failed to prove that defendants' conduct caused it injury. Appellants also contend that even if the State did adequately establish liability and injury, it was entitled to recover only a fraction of the amount it was awarded with respect to the highway construction contracts because most of those costs were funded by the United States Government. Finding no merit in any of appellants' contentions, we affirm the judgment.

## I. BACKGROUND

### A. *The Parties and the Prior Criminal Proceedings*

At all pertinent times herein, Hendrickson, Amfar, Lizza, and defendant Pratt & Pratt Inc. ("Pratt Inc."), were New York corporations engaged in the construction business on Long Island, New York, which includes Suffolk County. Ambrosio, Farino, and Anthony Farino were shareholders of Amfar and were, respectively, its president, secretary, and treasurer. Defendant Herbert Hochreiter was president of Lizza; defendant James J. Pratt ("Guy Pratt") was president of Pratt Inc.

The State commenced the present action in June 1983 pursuant to § 4 of the Clayton Act, 15 U.S.C. § 15 (1982). In its amended

complaint, the State principally sought (1) treble damages on its own behalf, alleging that all six appellants, along with the three defendants who are not appellants, had entered into a combination or conspiracy to "submit collusive, noncompetitive and rigged bids" to the State in connection with several contracts awarded by the State's Department of Transportation ("NYSDOT") for highway construction in 1977 and 1978; and (2) treble damages on behalf of the County, alleging that Amfar, Ambrosio, Farino, Anthony Farino (collectively the "Amfar defendants"), Lizza, and Hochreiter had conspired to fix prices in connection with highway construction materials purchased by the County in 1978 and 1979 (the "1978 and 1979 materials contracts"). The complaint also alleged that the two conspiracies violated the Donnelly Act, N.Y.Gen.Bus.Law §§ 340–347.

Following commencement of this action, proceedings were largely stayed pending completion of a criminal case then pending against most of the defendants. The Amfar defendants, Guy Pratt, and Pratt Inc. had been indicted in April 1983 by a federal grand jury for, *inter alia,* mail fraud, in violation of 18 U.S.C. § 1341 (1982), in connection with the bidding on contracts awarded by NYSDOT and the County. Lizza and Hochreiter were added as defendants by a superseding indictment. After a trial on these charges ended in a hung jury, a second superseding indictment was filed, naming only Lizza and Hochreiter as defendants and charging them with, *inter alia,* 32 counts of mail fraud in connection with the rigging of one highway repair contract awarded by NYSDOT in 1977 (the "Shelter Island" contract) and the rigging of the 1978 and 1979 materials contracts awarded by the County. Lizza and Hochreiter were convicted on these charges, and Lizza was fined $52,000 and ordered to forfeit $1,000,000; Hochreiter received a sentence that included a fine, forfeiture, and imprisonment. Their convictions were affirmed on appeal. *United States v. Lizza Industries, Inc.,* 775 F.2d 492 (2d Cir. 1985), *cert. denied,* 475 U.S. 1082, 106 S.Ct. 1459, 89 L.Ed.2d 716 (1986). In the meantime, Guy Pratt and Pratt Inc. had pleaded guilty to ten counts of mail fraud in connection with a NYSDOT contract awarded in 1978 (the "Wantagh Avenue" contract).

### B. *The Evidence in the Present Action*

Following conclusion of the criminal cases, proceedings in the present action were resumed, and the State's claims were tried to a jury. The principal issues included whether there was an overall conspiracy among all the defendants with respect to the NYSDOT contracts at issue here and whether there had been fraudulent concealment by the defendants sufficient to toll the four-year statute of limitations on the State's federal antitrust claims. The evidence, viewed generally in the light most favorable to the State, showed the following.

NYSDOT's normal practice was to award all highway construction contracts through a process of competitive bidding. Each bid form submitted by a contractor contained a statement certifying that the bid was not the result of collusion with other bidders. When a contract was awarded, the winning bidder signed a contract that reaffirmed the absence of collusion. As discussed in greater detail in Part II.B.1. below, the State accepted the noncollusion representations at face value and often revised its prior estimates of construction costs on the basis of the bids received.

During the period covered by the complaint, five highway construction contracts were awarded by NYSDOT to one of the defendant companies: the Veterans Memorial Highway ("Vets Highway") contract awarded to Lizza in February 1977, the Port Jefferson contract awarded to Amfar in June 1977, the Shelter Island contract awarded to Lizza in October 1977, the Long Island Expressway ("Expressway") contract awarded to Hendrickson in April 1978, and the Wantagh Avenue contract awarded to Pratt Inc. in October 1978. Virtually all of the losing bids on these five contracts were submitted by Hendrickson, Amfar, Lizza, or two other companies identified by an Amfar employee as members of a bid-rigging conspiracy. The 1978 and 1979 materials contracts were awarded by

the County to Lizza; Amfar was a losing bidder on each.

The State introduced in evidence the mail fraud convictions of Lizza and Hochreiter to prove that those defendants had participated in a scheme to defraud the State by rigging bids on the Shelter Island contract and to defraud the County by rigging bids on the 1978 and 1979 materials contracts. It introduced the mail fraud convictions of Pratt Inc. and Guy Pratt to prove that the Pratt defendants had participated in a scheme to defraud the State by rigging bids on the Wantagh Avenue contract.

To support its contention that all of the defendants had participated in an overall conspiracy to rig the NYSDOT contracts, the State relied principally on the testimony of former Amfar vice president and controller Joseph LoMonte. LoMonte testified that in early 1977, Amfar, one of the smaller highway construction contractors on Long Island, had been approached by Frank Mascali & Sons ("Mascali"), a New York City contractor. Mascali asked Amfar to join it in making a joint-venture bid on the Vets Highway project, seeking to retaliate against Lizza for violating a territorial division agreement. Amfar decided against joining Mascali in such a bid. Amfar president Ambrosio then told LoMonte that the bidding on the Vets Highway contract had been rigged, that Lizza would win the contract, and that "as a reward" for not bidding with Mascali, Lizza would give Amfar a very lucrative subcontract on the project. There promptly followed a pre-bid agreement between Lizza and Amfar, subcontracting to Amfar one mile of the 13-mile Vets Highway job at a price of $899,911. LoMonte testified that had Amfar bid on this subcontract, its normal bid would have been $511,558, which would have included its profit. Thus, for not bidding on the Vets Highway job, Amfar was given an *excess* profit of $338,000 on a $512,000 job.

LoMonte testified that after the Vets Highway contract was awarded to Lizza, Amfar secretary Jack Farino told him that Farino had attended a meeting in Farmingdale, Long Island, at which he learned "how the bids [we]re being rigged, who the individuals or the corporations were that were involved." Farino told LoMonte that the bids were rigged by a group of five contractors referred to as the "Club of Five" (or the "Club"), and that the five members of the Club were Lizza, Hendrickson, J.D. Posillico ("Posillico"), Zara Construction ("Zara"), and one other contractor that LoMonte was unable to recall. Thereafter, Ambrosio informed LoMonte that officials of two labor unions also were members of the bid-rigging scheme. While Farino was in Farmingdale, which was the location of the offices of Posillico and one of the unions involved, the Club members held a meeting behind closed doors, which Farino was not allowed to attend.

Farino described to LoMonte how the bid rigging was to work. Amfar would be told on what contract it was to be low bidder, and it would be required to prepare a bid. After Amfar arrived at its proposed bid figure, it was to communicate to "Farmingdale" the number that the other contractors' bids must exceed. Amfar was advised not to "get too greedy," *i.e.*, it was to limit the excess profit included in its bid to 20–25% and was not to seek excess profits of 40–50%. Later review by Ambrosio of bids submitted by other co-conspirators led him to the conclusion that most of them were submitting bids that included excess profits higher than the 20–25% benchmark.

Prior to the bidding deadline for the Port Jefferson job, awarded in June 1977, Ambrosio told LoMonte that it had been determined that Amfar would be the low bidder. He instructed LoMonte to develop bidding figures so that they could "forward the numbers on to Farmingdale." The two then arrived at a final bid of $1.2 million. However, prior to communicating this figure to Farmingdale and submitting it to the State, Amfar had it reviewed by Hendrickson. Hendrickson advised that the $1.2 million figure was "way too low." Accordingly, Amfar increased its bid to $1.79 million and informed "Farmingdale" that the accommodation bids by other contractors should be above $1.8 million. Amfar was awarded the Port Jefferson contract at $1.79 million. The other bidders on this project, whose bids ranged from $1.835 mil-

lion to $2.199 million, were Hendrickson, Lizza, and Posillico.

On the Shelter Island project, awarded in October 1977, Amfar prepared an accommodation bid at the request of Lizza one day before the bidding deadline. Ambrosio told LoMonte that Lizza was to be the low bidder on this job and would furnish Amfar with the figure above which Amfar was to bid. Lizza's bid for the Shelter Island job was $2.648 million; Amfar's accommodation bid was $3.282 million. LoMonte testified that even $2.6 million was beyond the amount in which Amfar could obtain a performance bond from its surety company, and absent the request of Lizza, Amfar would not have bid on this project. The only other bidder on the project was Hendrickson. Lizza was the low bidder and was awarded the contract.

In April 1978, Amfar submitted an accommodation bid on the Expressway project, this time at the request of Hendrickson. Although Amfar had previously been approached by a company from the midwest to bid on this project, it had no intention of doing so. Thereafter, however, Hendrickson informed Amfar that Hendrickson would be the low bidder and that it wanted Amfar to submit an accommodation bid. Hendrickson did not provide LoMonte with its final figure for this project until near midnight on the night before the bidding deadline. When LoMonte, who had traveled to Albany in order to be on hand to submit Amfar's bid to the State when it was completed, called Ambrosio that evening to advise him of the delay, Ambrosio directed him to "stay there, when you do receive the number, whatever number they give you, put it in and submit the bid." Eventually, Hendrickson gave LoMonte a figure of $9.3 million, and Amfar submitted a bid in the amount of $9.412 million. Amfar's bid was far in excess of its bonding capacity, and LoMonte, at Ambrosio's instruction, telephoned Amfar's bonding broker to reassure him that the bid was not a serious one. Hendrickson was the low bidder on the Expressway project and was awarded the contract. In addition to Amfar, the only other bidder was Posillico.

Each bidder on a NYSDOT contract was required to submit with its bid a certified check payable to the State, as a form of guarantee that the contractor, if it turned out to be the low bidder, would sign the contract and perform the work at the prices listed in the bid. NYSDOT's practice was to retain the checks of both the low bidder and the second-lowest bidder until the company awarded the contract provided a performance bond. For the Expressway project, Amfar's check was for approximately $200,000, and as Amfar was the second-lowest bidder, its check was retained by the State for a period of time. In the meantime, since it borrowed the money required to fund the certified checks needed to accompany its bids, Amfar was paying interest on the $200,000. LoMonte testified that when he raised the matter of the interest cost with Ambrosio, Ambrosio told him that "while it was fairly expensive, not to worry about it, we would just add it on to the next bid that they gave us, we would just add it on to that cost."

The bidding deadline for the Wantagh Avenue contract was October 19, 1978. On October 18, Guy Pratt informed Farino, Anthony Farino, and LoMonte that Pratt Inc. would be the low bidder. Guy Pratt asked that Amfar submit an accommodation bid because he was apprehensive that his other accommodation bidders were not going to submit their bids and he wanted to be absolutely certain that there would be at least one. Although Amfar had theretofore done nothing whatever to calculate the cost of the Wantagh Avenue job, it put together a bid using figures supplied by Pratt Inc. LoMonte arranged to have the required bidding check certified after banking hours, and Amfar submitted the requested accommodation bid. Hendrickson also submitted a bid. Pratt Inc. was the low bidder and was awarded the contract.

LoMonte also described preparing Amfar's accommodation bids on the 1978 and 1979 materials contracts awarded by the County, on which Lizza was intended to be the low bidder. On the 1978 contract LoMonte made a clerical error in preparing the bid and thereby nearly caused Amfar to

be awarded the contract as low bidder. At Farino's instruction, LoMonte called the County to request that Amfar be allowed to withdraw its bid. LoMonte gave a false explanation for the request. Also at Farino's instruction, LoMonte telephoned Lizza's president Hochreiter to apologize for the near foul-up and to assure him that Lizza would indeed be recognized as the low bidder. The following year, Lizza informed Farino that Lizza was to be low bidder on the 1979 materials contract to be awarded by the County in January 1979 and again asked Amfar to submit an accommodation bid. Farino passed this along to LoMonte and repeatedly admonished him not to make a mistake, as he had the year before, that could cause Amfar to be the low bidder. Lizza was awarded both of these contracts.

In order to meet defendants' statute-of-limitations defense, the State sought to show that there had been fraudulent concealment of its claims until well within the four-year period of limitations provided by § 4B of the Clayton Act, 15 U.S.C. § 15b (1982). It relied in part on the certificates of noncollusion submitted by each bidder, on other affirmative acts of concealment by the Amfar defendants, and on testimony by a federal investigator, who had uncovered the bid-rigging scheme, that he had not informed the State or the County of the scheme until some time in the 1980's.

## C. *The Verdicts in the Present Action*

The court submitted special interrogatories to the jury on the existence of the two conspiracies alleged in the complaint, their memberships, the statute-of-limitations defense, and damages. The jury found that each of the nine defendants had entered into an overall conspiracy to rig bids on the NYSDOT contracts at issue, and that the Amfar defendants, Lizza, and Hochreiter had entered into a conspiracy to fix prices on the 1978 and 1979 materials contracts awarded by the County. The jury found that neither the State nor the County was aware of the conspiracies prior to June 16, 1980; that the coconspirators took affirmative steps to conceal the existence of the two conspiracies; and that neither the

State nor the County, by exercising due diligence, could have discovered the existence of those conspiracies prior to that date.

On the question of damages, the jury found that the State had been injured in the following amounts on the NYSDOT contracts:

| | |
|---|---|
| Vets Highway | $ 584,000 |
| Port Jefferson | 67,000 |
| Shelter Island | 644,000 |
| Expressway | 1,113,000 |
| Wantagh Avenue | 77,000 |
| Total | $2,485,000 |

It found that the County had been injured in the total amount of $125,000 on the 1978 and 1979 materials contracts.

The court trebled each amount awarded by the jury and entered judgment in favor of the State for $7,455,000 against all defendants on the NYSDOT claims, and for $375,000 against the Amfar defendants, Lizza, and Hochreiter on the County claims. In addition, it imposed a civil penalty of $100 on each defendant pursuant to § 342–a of the Donnelly Act.

Defendants' motions for judgment n.o.v. or a new trial were denied. Pratt Inc. and Guy Pratt paid the State $275,200 in settlement of the judgment against them. The remaining defendants appealed. Hochreiter has since withdrawn his appeal.

## II. DISCUSSION

Appellants, singly or in combination, make a variety of arguments on appeal. They contend principally (1) that LoMonte's Club–of–Five testimony was inadmissible hearsay and that, without that testimony, the evidence was insufficient to prove the existence of an overall conspiracy; (2) that the evidence was insufficient to establish that the State suffered any injury as a result of the defendants' activities; (3) that the trial court erred in refusing to reduce the $2,485,000 award on the NYSDOT contracts to account for the partial federal funding of the highway construction costs; and (4) that the action should have been dismissed on statute-of-limitations grounds because the State did not adequately prove

fraudulent concealment. In addition, Lizza and the Amfar defendants argue that the criminal convictions of Lizza, Hochreiter, Pratt Inc., and Guy Pratt were not admissible in evidence; the Amfar defendants argue that, if the judgments were admissible against the convicted defendants, the court should have granted the Amfar defendants a separate trial. We have considered all of appellants' contentions and have found them to be without merit.

A. *The Admissibility of LoMonte's Club-of-Five Testimony*

LoMonte's testimony recounting Farino's description of the Farmingdale meeting of the Club of Five and identification of the Club members was admitted, over hearsay objections, against Farino as an admission, *see* Fed.R.Evid. 801(d)(2)(A), and against Amfar as a statement of its employee within the scope of his employment, *see* Fed.R. Evid. 801(d)(2)(D). At the close of the evidence, the district court ruled that the statements of Farino were also admissible against all of the other defendants as co-conspirator statements made in furtherance of an overall conspiracy. *See* Fed.R. Evid. 801(d)(2)(E). Lizza and Hendrickson challenge this ruling, contending principally that there was insufficient evidence, independent of the Club-of-Five testimony itself, to establish the existence of an overall conspiracy rather than merely a number of discrete conspiracies, each directed at a particular NYSDOT contract. Lizza contends that the ruling unfairly caused it to be held liable for injury to the State on two contracts on which Lizza was neither low bidder nor an accommodation bidder. In addition, Lizza and Hendrickson contend that, even if an overall conspiracy was shown, the testimony was inadmissible because Farino had no personal knowledge of what was said at the Club meeting and the statements he uttered were themselves hearsay. We reject these contentions.

■ Under Rule 801(d)(2)(E), an out-of-court statement is not hearsay with respect to a given party if it was made by a co-conspirator of that party in furtherance of the conspiracy. In order to admit such a statement, the trial court is required to find, as preliminary facts under Fed.R.Evid. 104(a), that a preponderance of the evidence supports the conclusions that there was a conspiracy, that both the declarant and the party against whom the statement is offered were members of it, and that the statements were made in furtherance of the conspiracy. *See, e.g., United States v. DeJesus,* 806 F.2d 31, 34–35 (2d Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1299, 94 L.Ed.2d 155 (1987). In making its preliminary factual determinations, the court may take into account not only the other evidence before it, but also the proffered out-of-court statements themselves if those statements are sufficiently reliable in light of independent corroborating evidence. *Bourjaily v. United States,* —— U.S. ——, 107 S.Ct. 2775, 2781–82, 97 L.Ed.2d 144 (1987). The trial court's determinations of these preliminary facts may not be disturbed unless they are clearly erroneous. *Id.* 107 S.Ct. at 2782. We have no difficulty in upholding the findings of the trial court in the present case.

■ Appellants do not contend that the evidence failed to establish the existence of any conspiracy whatever; nor could they sensibly do so, for it is plain that there was conspiratorial bidding on each of the five NYSDOT contracts at issue here. There was, at the very least, agreement between Amfar and Hendrickson on the Port Jefferson contract, between Amfar and Lizza on the Shelter Island contract, between Amfar and Hendrickson on the Expressway contract, and between Amfar and Pratt on the Wantagh Avenue contract. Lizza's payment to Amfar of an inordinately high amount on the Vets Highway subcontract, together with the correct prediction of Lizza's being low bidder on the Vets Highway contract, permitted an inference of collusion on that contract as well. The pattern of defendants' activity with respect to the five contracts and the very nature of bid-rigging conspiracies made it more likely than not that these were not, as Lizza and Hendrickson would have it, isolated, single-contract conspiracies for which only the direct participants could be held liable.

First, by its nature, a bid-rigging enterprise normally requires a significant number of participants. In order to predetermine who will win a given auction it is desirable to coopt virtually all companies that are thought likely to submit low bids. *See generally Colorado ex rel. Woodard v. Western Paving Construction Co.*, 833 F.2d 867, 881 (10th Cir.1987). Moreover, as discussed in greater detail in Part II.B.1. below, after receiving bids, NYSDOT customarily considered whether it had received a sufficient number of bids to satisfy statutory requirements that the contract be awarded after a competitive auction. Thus a bid-rigging enterprise had to have enough members to ensure that the State would feel it had enough bids on any given contract to warrant awarding the contract immediately rather than calling for new bids.

The pattern of conduct shown in the present action further supported the inference that a number of companies had confidence in the efficacy of their scheme to rig bids on the NYSDOT contracts, which in turn supported the inference that there was a sizeable conspiracy. For example, though the contracts were normally advertised four-to-six weeks before the bidding deadline, three different contractors (Lizza on Shelter Island, Hendrickson on Expressway, and Pratt on Wantagh Avenue) sought and obtained accommodation bids from Amfar by contacting it or providing the necessary information just one day before the bids were due. The ease with which accommodation bids were arranged at the eleventh hour supported an inference (a) that the predetermined low bidders had confidence that they could count on obtaining accommodation bids without hesitation, and (b) that those belatedly contacted had confidence that they too would one day be guaranteed a low bidder position. Sufficient accommodation and reciprocity guarantees could not be provided by one or two companies acting alone but rather suggested the existence of a larger organization. Further, several facts were inexplicable unless the accommodation bidders had assurance that they would profit in some illicit way. These included the willingness of a company (*e.g.*, Hendrickson on Port Jefferson, Amfar on three other contracts) to expend time in preparing a bid that it knew would be a loser; Amfar's willingness to submit bids that were far greater than its bonding capacity; and Amfar's willingness to incur substantial interest expense on its accommodation bids. Finally, the very facts that (a) prior to the bid letting on each of the five NYSDOT contracts at issue here, Amfar was informed as to precisely which of the four defendant contractors would be the low bidder, and (b) in each instance the identified contractor was in fact the low bidder strongly indicated the existence of one conspiracy that included at least those four corporate defendants and their key officers. The inference that such a conspiracy existed was further supported by the fact that, of the 19 bids submitted to the State on these five NYSDOT contracts, 17 were submitted by the four corporate defendants, Zara, and Posillico.

Thus, given the evidence as to the actual operation of the bid rigging on the NYSDOT contracts and the reasonable inferences drawn from the manner of operation, we conclude that the trial court did not commit clear error in its preliminary finding that a preponderance of the evidence—even ignoring the Club-of-Five testimony itself—indicated there was an overall conspiracy to rig the bids on the five NYSDOT contracts at issue. In light of the facts that Lizza was awarded a plurality of these contracts and that Hendrickson was a bidder on all of them, we see no error in the inference that Lizza and Hendrickson, along with the Amfar defendants and the Pratt defendants, were among the conspiracy's members. Nor can there be any question that Farino's statements to LoMonte, describing how Amfar would participate in the bid rigging and identifying others who would participate, were "in furtherance of" the conspiracy. Thus, the requirements of Rule 801(d)(2)(E) were satisfied.

■ We find no merit in the contention that the court should have excluded Farino's statements pursuant to Fed.R.Evid. 805 because they themselves contained

hearsay statements by other unidentified declarants. Rule 805 provides for the exclusion of "[h]earsay included within hearsay" unless the included statement, as well as the encompassing statement, is covered by some exception to the hearsay rule. Whether or not Rule 805 is applicable when the encompassing statement is defined as nonhearsay, as is true of coconspirator statements, and the only hearsay is a statement contained in the nonhearsay statement, *compare Cedeck v. Hamiltonian Federal Savings & Loan Ass'n*, 551 F.2d 1136, 1138 (8th Cir.1977) (hearsay within coconspirator statement excludable unless it meets a hearsay exception), *with United States v. McLernon*, 746 F.2d 1098, 1106 (6th Cir.1984) (upholding admissibility without reference to such exceptions), we reject appellants' contention because the challenged contents of Farino's statements were not themselves hearsay. First, we note that LoMonte's description of what Farino told him did not refer to statements by others to Farino, and a portion of Farino's report to LoMonte may well have been based on independent observation. Farino himself had been at a meeting in Farmingdale, and though he was not allowed to attend the discussion that was conducted behind closed doors, there was no evidence that prevented the jury from inferring that he had identified the participants in the closed meeting by visual recognition of those who entered or left the closed room. Further, though some, or even all, of Farino's statements to LoMonte may have been premised on what Farino was told, the instructions to Farino as to the manner in which Amfar was to conduct itself in the bid-rigging operation, and with whom it was to deal, were not hearsay but rather were properly admissible as a "verbal act" describing the making or terms of the conspiratorial agreement. "'The hearsay rule does not exclude relevant testimony as to what the contracting parties said with respect to the making or the terms of an oral agreement.'" 4 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 801(c)[01], at 801–72 (1987) (quoting *Creaghe v. Iowa Home Mutual Casualty Co.*, 323 F.2d 981, 984 (10th Cir.1963) (emphasis deleted)). *See* Fed.R.Evid. 801(c) Advisory Note (the "entire category of 'verbal acts'" is excluded from the definition of "hearsay"). Nor is the fact that Farino was not present at the closed meeting an impediment to admission of the instructions he was given as to how Amfar was to conduct itself and with whom it was to deal. There is no requirement that the hearer of a verbal act have first-hand knowledge of how the other parties to the contract arrived at their willingness to agree to those terms. *Cf. United States v. Ammar*, 714 F.2d 238, 254 (3d Cir.), *cert. denied*, 464 U.S. 936, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983); *United States v. McLernon*, 746 F.2d at 1106 (personal knowledge not required as foundation for admission of coconspirator statements pursuant to Rule 801(d)(2)(E)).

In sum, we reject appellants' contention that the Club-of-Five testimony should have been excluded. The independent evidence corroborated Farino's statements as to the members and operations of the Club sufficiently to warrant the admission of those statements in evidence against all of the defendants as statements of their coconspirator in furtherance of the conspiracy. With the admission of those statements, there was ample evidence from which the jury, which was repeatedly instructed that it must determine whether there was a single overall conspiracy as the State alleged or merely discrete little schemes as the defendants argued, could infer that all of the defendants participated in one conspiracy to rig the bidding on the five NYSDOT contracts.

## B. *Injury and Damages*

All of the appellants contend that they were entitled to judgment n.o.v. on the ground that the State failed to present any evidence of the market value of the goods and services covered by the awarded contracts and hence failed to prove that it was in any way injured by the actions of the defendants, or if injured, to what extent. Alternatively, they contend that the State was not entitled to recover damages for so much of the cost of the NYSDOT contracts

as was federally funded. We are unpersuaded.

### 1. The Fact of Injury

■ An antitrust plaintiff seeking treble damages under § 4 of the Clayton Act is required to prove that he suffered actual injury in his business or property as a result of the defendant's violation of the antitrust laws. *See J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 562, 101 S.Ct. 1923, 1927, 68 L.Ed.2d 442 (1981); *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 1571 n. 9, 23 L.Ed.2d 129 (1969); *Klinger v. Baltimore & Ohio Railroad Co.*, 432 F.2d 506, 516 (2d Cir.1970). This requirement may be met by "proof of *some* damage flowing from the unlawful conspiracy." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. at 114 n. 9, 89 S.Ct. at 1571 n. 9 (emphasis in original).

In reviewing a contention that the plaintiff's failure to prove injury entitles the defendant to judgment n.o.v., we must view the evidence in the light most favorable to the party in whose favor the verdict was returned, and that party must be given the benefit of all reasonable inferences that might have been drawn in his favor from the evidence. *See Bohack Corp. v. Iowa Beef Processors, Inc.*, 715 F.2d 703, 712 (2d Cir.1983); *Simblest v. Maynard*, 427 F.2d 1, 4 (2d Cir.1970). The denial of judgment n.o.v. may be overturned only if "the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable men could have reached." *Id.*

■ The evidence in the present case was ample to permit the jury to infer that the State had been injured by the defendants' bid-rigging scheme. It was easily inferrable from LoMonte's testimony that the members of the conspiracy made bids that were higher than they would have been if there had been no conspiracy. For example, on the Port Jefferson contract, on which Amfar was intended to be the low bidder, Amfar prepared a bid of $1.2 million, which was then reviewed by Hendrickson; Hendrickson informed Amfar that the bid was too low, and, accordingly, Amfar raised its bid to $1.79 million. The jury could similarly infer that the amount bid by Lizza on the Vets Highway contract was inflated over what would have been bid in the absence of a bid-rigging conspiracy. Lizza gave Amfar a subcontract on that job as a reward for not joining Mascali in a bid against Lizza. That subcontract gave Amfar some $388,000 more than its normal profit on that subcontract, and the jury could infer that Lizza's bid was inflated by at least that amount. From the instructions Amfar received to use a benchmark of 20–25% for its excess profits when it was the predetermined low bidder, and the evidence that Ambrosio had reviewed other contractors' bids and determined that Amfar's coconspirators were in fact overcharging by more than that amount, the jury could infer that the coconspirators commonly included in their bids a profit component that was at least 20–25% higher than it would have been in the absence of the bid rigging.

For each planned highway construction contract, the State prepared confidential cost estimates to assist it in planning; the estimates were based in part on its experience with bids by contractors on recent projects. NYSDOT engineer Fredrick Muhlig, whose duties included reviewing all bids submitted on NYSDOT contracts, testified that NYSDOT used these estimates in deciding whether to award the contract or to postpone the project. Many of the bids received did not exceed the estimate by more than 10%. Where this was the case, the State conducted only a general examination, consisting of a check to see that enough contractors had bid on the project and a doublecheck of its prior estimate to be sure there was no major error on its part. For those contracts on which the low bid exceeded the engineers' estimate by more than 10%, NYSDOT also considered these factors but in addition considered many others and reconsidered whether to proceed with the project, assessing whether proceeding as scheduled was critical from a safety standpoint and

whether it was likely that lower bids would be received if the project were postponed. In some instances, the State simply revised its estimate upward on the theory that "the competitive bids [were] a better reflection of costs in the current market." The State accepted at face value the bidders' noncollusion representations and operated on the assumption that the bids received reflected the operation of free market forces without any collusion among bidders.

On four of the five NYSDOT contracts at issue here, the low bids exceeded the State's initial estimates by more than 10%; the State's review of those four resulted in upward revisions of the estimates. Even with the revisions, all of the bids submitted on all five contracts were higher than the final estimates. A total of 19 bids were received on these five contracts; all but two of them were submitted by the defendant companies, Zara, and Posillico.

The evidence that the coconspirators' practice was to include excess profits of 20–25% in their bids was applicable not only to the NYSDOT contracts but also to the materials contracts awarded by the County. Thus, though the State presented no evidence as to the County's engineering estimates of the projected cost of the materials, the 20–25%–benchmark evidence permitted the jury to infer that the materials contracts too were awarded at prices higher than they would have been if there had been no bid rigging.

In all, the evidence was ample to permit the jury to find that the bid-rigging conspiracies resulted in the low bidders' submitting bids that were well in excess of what they would have been in the absence of bid rigging, and that the State and the County therefore were in fact injured by the conspiracies.

### 2. The Jury's Calculation of Damages

Appellants also contend that they were entitled to judgment n.o.v., or at least a new trial, because the evidence was insufficient to permit the jury to arrive at an adequately precise quantification of the damages suffered by the State and the County. They contend that the amounts awarded by the jury were arbitrary and speculative. We disagree.

■■■ Where the antitrust violation is a price-fixing conspiracy, the measure of damages to one of the coconspirators' customers is the difference between the prices actually paid and the prices that would have been paid absent the conspiracy. *E.g., Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 489, 88 S.Ct. 2224, 2228–29, 20 L.Ed.2d 1231 (1968); *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 297 (2d Cir.1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980); *Burlington Industries, Inc. v. Milliken & Co.,* 690 F.2d 380, 385–86 (4th Cir.1982), *cert. denied,* 461 U.S. 914, 103 S.Ct. 1893, 77 L.Ed.2d 283 (1983). The normal frame of reference for "what would have been" paid is the market value of the goods or services in the absence of the collusive action. Where, however, there is a dearth of market information unaffected by the collusive action of the defendants, the plaintiff's burden of proving damages is, to an extent, lightened, for "it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts." *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 563, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931); *see J. Truett Payne Co. v. Chrysler Motors Corp.,* 451 U.S. at 568, 101 S.Ct. at 1930; *Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 264–65, 66 S.Ct. 574, 579–80, 90 L.Ed. 652 (1946). Although the jury is not allowed to base its damages assessment on speculation or guesswork, it is entitled to

> make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly. In such circumstances "juries are allowed to act upon probable and inferential, as well as direct and positive proof." ... Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim. It would be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of

damages uncertain. Failure to apply it would mean that the more grievous the wrong done, the less likelihood there would be of a recovery.

The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.

*Id.* at 264, 66 S.Ct. at 580 (quoting *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. at 564, 51 S.Ct. at 251); *see J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. at 566–67, 101 S.Ct. at 1929–30 ("it does not 'come with very good grace' for the wrongdoer to insist upon specific and certain proof of the injury which it has itself inflicted") (quoting *Hetzel v. Baltimore & Ohio Railroad Co.*, 169 U.S. 26, 39, 18 S.Ct. 255, 260, 42 L.Ed. 648 (1898)).

■ In the present case, the State suggested two theories upon which damages on the highway construction contracts might be calculated. It argued that it should be awarded either the gross profits received by the defendants on each contract they were awarded, or the difference between the amounts of the low bid and the NYSDOT engineering estimate on each of those contracts. On the materials contracts awarded by the County, the State argued that the jury should calculate damages on the basis that the low bidders added 25% excess profits to their bids. The trial court instructed the jury that

> the measure of damages is the difference between what the State paid on the [NYS]DOT contracts and what the price would have been had there been no overall conspiracy to rig bids as alleged in the complaint. And similarly, on the second claim that refers to the County of Suffolk Department of Works contracts, the difference between what the County of Suffolk paid and what they would have paid if there had not been a collusive agreement as alleged in the complaint.

(Trial Transcript ("Tr.") 2379.)

On the NYSDOT contracts, the jury awarded amounts ranging from $67,000 to $1,113,000. In each instance, the amount awarded was one-half of the difference between the NYSDOT engineer's estimate and the low bid. Given the unequivocal evidence that the coconspirators artificially raised the amounts of their bids, and the evidence that in some instances the State revised its estimates upward either because it discovered a flaw in its original estimate or because it assumed that the bidding more accurately reflected the market value of the services required for the project, it appears that the jury's award was not an unreasonable estimate of damages.

■ On the materials contracts awarded by the County, the jury seems also to have made an adjustment it considered equitable and reasonable, again awarding the State an amount less than what was requested. Though the State argued that the overcharges described in LoMonte's testimony warranted a recovery of $500,000 on the materials contracts, the jury awarded one-quarter of that amount. It may well be that the jury made the steeper discount of the amount requested on these contracts because it had not been presented with engineers' estimates on the materials contracts as it had been on the NYSDOT contracts. While the proof of the amount of damage was thus less definite with respect to the materials contracts, the jury was not confronted with an all-or-nothing proposition, for it did have before it the evidence that the coconspirators' bids on the materials contracts included at least 20–25% excess profits. Given the adequacy of the proof that the State suffered some injury, the jury was not required to deny all recovery simply because it determined that the State was not entitled to the entire amount requested.

In sum, we cannot accept appellants' contention that the jury's decision to award the State various fractions of the amounts demanded was not an equitable and reasonable one, for to do so in the circumstances here would permit defendants to profit by their wrongdoing at the expense of the person injured.

### 3. The Matter of Federal Funding

Finally, appellants contend that the State was not entitled to recover some 75% of the

moneys it paid on the NYSDOT contracts because the federal government contributed at least that proportion of the moneys paid to the defendants on those contracts. We are unpersuaded.

▓ In general, the person who has purchased directly from those who have fixed prices at an artificially high level in violation of the antitrust laws is deemed to have suffered the antitrust injury within the meaning of § 4 of the Clayton Act, and hence may recover the entire amount of the illegal overcharge even if some or all of the overcharge may have been passed on to others. *See Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. at 491–94, 88 S.Ct. at 2230–32. The Supreme Court has construed *"Hanover Shoe* as resting on the judgment that the antitrust laws will be more effectively enforced by concentrating the full recovery for the overcharge in the direct purchasers rather than by allowing every plaintiff potentially affected by the overcharge to sue only for the amount it could show was absorbed by it." *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 734–35, 97 S.Ct. 2061, 2069, 52 L.Ed.2d 707 (1977). The principal rationale for this judgment was that antitrust treble-damage actions should not be complicated by a need to trace the effects of the overcharge with respect to such matters as prices, costs, and the potentially different behavior of all the pertinent variables in the absence of the overcharges. The Court has noted that a passing-on defense "might" be permitted "where 'an overcharged buyer has a preexisting "cost-plus" contract, thus making it easy to prove that he has not been damaged....'" *Id.* at 724 n. 2, 97 S.Ct. at 2064 n. 2 (quoting *Hanover Shoe,* 392 U.S. at 494, 88 S.Ct. at 2232). The reason for this possible exception is that the "customer is committed to buying a fixed quantity regardless of price. The effect of the overcharge is essentially determined in advance, without reference to the interaction of supply and demand that complicates the determination in the general case." *Illinois Brick,* 431 U.S. at 736, 97 S.Ct. at 2070.

▓ Within this framework, the district court properly refused to allow defendants to explore and claim credit for the portions of the NYSDOT contracts that were paid for by the federal government. There is no question that the direct purchaser from the defendant contractors was the State and that if there was any depletion of the federal coffers the federal government's injury was derivative rather than direct. The government's obligations ran to the State, which acquired contractual rights to reimbursement for moneys it expended on highway construction upon satisfaction of various conditions imposed by federal law. *See* 23 U.S.C. § 110 (1982). In discharging its contractual obligation to repay a share of the State's highway construction expenses, the government dealt only with the State, making its payments to "such official or officials ... as may be designated by the State highway department and authorized under the laws of the State to receive public funds of the State." *Id.* § 121(e). The government neither dealt with the contractors nor owed them any funding duty. Its relationship to the highway contractors is plainly analogous to that of an indirect purchaser.

We see little merit in any suggestion that the NYSDOT contracts were in effect "cost-plus" contracts as to which a passing-on defense might be available. Muhlig testified that the federal government allotted the State a certain amount of money "for projects in certain cat[e]gories," such as repair of interstate highways, repair of bridges, and so forth. If the State reached the limit of its funding within a certain category, it had no option to draw funds from amounts left over in another category. Plainly, the matter of federal funding is a complicated one. In the absence of an offer of proof by appellants of a contract showing that the effect of their overcharges was "essentially determined in advance," the trial court did not err in curtailing defendants' pursuit of such questions as the extent to which the federal funds spent on overcharges would have been usable, absent the overcharges, for other highway construction work in the same category, what conditions would have to be met

for such use, and whether such conditions could or would have been met. The very pursuit of these lines of questioning would have defeated the primary purpose of the rule prohibiting passing-on defenses, which is to eliminate any need to explore such complexities.

Appellants cite *State of Tennessee ex rel. Leech v. Dole*, 749 F.2d 331 (6th Cir.1984) ("*Leech*"), *cert. denied*, 472 U.S. 1018, 105 S.Ct. 3480, 87 L.Ed.2d 615 (1985), for the proposition that the State simply has no legal interest in the funds it receives from the federal government. Their reliance is misplaced. In *Leech*, Tennessee, which had received funds in settlement of a civil antitrust action alleging bid rigging, sought to enjoin the federal government from setting off, against the current highway funds allocated to Tennessee, an amount claimed by the federal government as its share of the settlement. The Sixth Circuit held that as a matter of equity, the government was entitled to a share of the settlement since the federal funds had been paid "by mistake" on the assumption that the settling contractors had complied with the competitive bidding requirements of the Federal–Aid Highways Act, 23 U.S.C. § 112 (1982). *See Leech*, 749 F.2d at 336; *but see United States v. Azzarelli Construction Co.*, 647 F.2d 757, 762 n. 5 (7th Cir.1981) (state's contractual right to federal funds not defeated by bid rigging among contractors so long as contracts were awarded through competitive procedures required by § 112). Though *Leech* may stand for the proposition that the federal government may recover from a state some portion of the state's recovery from the bid riggers, it does not purport to give the bid riggers any right to a reduction of their own liability on account of the federal government's right to recover from the state.

With respect to the five NYSDOT contracts at issue here, if the federal government is eventually found to be entitled to receive reimbursement or credit from the State for the portion of the contracts that were federally funded, the purpose of the antitrust laws will have been served: the wrongdoers will have lost their unlawful gains to the parties that were injured directly and indirectly. If the federal government obtains no portion of the State's recovery, it is possible that the State will have received a windfall; but the State plainly has a greater right to any windfall than have the defendant wrongdoers.

## C. *The Use of the Prior Convictions*

Lizza and the Amfar defendants contend that they are entitled to a new trial because they were unfairly prejudiced by the State's introduction of the mail fraud convictions of Lizza, Hochreiter, Pratt Inc., and Guy Pratt. They argue principally that the trial court improperly gave estoppel effect to the convictions, and that even giving the convictions prima facie effect rather than preclusive effect would have been improper because the jury in the criminal case could have convicted without finding bid rigging. The Amfar defendants also contend that once the court decided to allow the State to use the judgments of conviction against the convicted defendants, it should have allowed a separate trial of the claims against the Amfar defendants. None of these contentions has any merit.

First, though the district court might well have accorded the judgments estoppel effect against the convicted defendants, *see, e.g., Dorman v. Higgins*, 821 F.2d 133, 136 (2d Cir.1987) (party other than government may assert collateral estoppel against convicted defendant with respect to facts necessarily determined in criminal proceeding); *Gelb v. Royal Globe Insurance Co.*, 798 F.2d 38, 43 (2d Cir. 1986) (same), *cert. denied*, —— U.S. ——, 107 S.Ct. 1608, 94 L.Ed.2d 794 (1987), it is plain from the trial record that the court did not in fact give the criminal convictions preclusive effect. Rather, the court allowed the State to use the judgments only as prima facie evidence that each of the convicted defendants had engaged in the collusive scheme or schemes with respect to which his or its guilt was established in the criminal case. When the judgments were first received in evidence, the court informed the jury that they were prima

facie evidence, which the court said meant "some evidence," that the convicted defendants had participated in those schemes. (Tr. 1552, 1553.) In its final instructions, the court instructed the jury that "prima facie evidence is proof that establishes the fact *in the absence of proof to the contrary.* So *if* there is no proof to the contrary, you must accept that as the fact." (Tr. 2378 (emphasis added).) Accordingly, the record provides no support for the contention that the judgments of conviction were given preclusive effect.

█ Second, we find no error in the trial court's ruling that the judgments of conviction sufficiently determined facts relevant to the State's civil claims to permit use of the judgments by the State in the present action. A prior judgment of conviction may be used as prima facie evidence in a subsequent civil suit only with respect to matters of fact or law "necessarily decided by the conviction and the verdict on which it was based." *Emich Motors Corp. v. General Motors Corp.,* 340 U.S. 558, 569, 71 S.Ct. 408, 414, 95 L.Ed. 534 (1951); *cf.* Fed.R.Evid. 803(22) (hearsay rule does not require exclusion of "[e]vidence of a final judgment, entered after a trial or upon a plea of guilty ... adjudging a person guilty of a [felony], to prove any fact essential to sustain the judgment"). What issues were decided in the criminal case is a question of law that "must be determined by the trial judge hearing the treble-damage suit, upon an examination of the record, including the pleadings, the evidence submitted, the instructions under which the jury arrived at its verdict, and any opinions of the courts." *Emich Motors Corp. v. General Motors Corp.,* 340 U.S. at 569, 71 S.Ct. at 414.

█ In the present case, Judge Mishler determined as a matter of law that the verdicts of guilt against Lizza and Hochreiter were premised on findings that they had engaged in collusive bidding on the Shelter Island contract awarded by NYSDOT and the two materials contracts awarded by the County, and that the pleas of guilty by Pratt Inc. and Guy Pratt established that the Pratt defendants had engaged in collusive bidding on the Wantagh Avenue contract. As the judge who presided over the criminal proceedings as well, Judge Mishler was especially well situated to determine what those proceedings had established. In so doing, he looked in part to the instructions he had given the jury in the case against Lizza and Hochreiter. Those instructions stated that "[w]hat the evidence must show beyond a reasonable doubt is that the members of the scheme ... came to a mutual understanding to accomplish the bid rigging scheme" (Trial Transcript in *United States v. Lizza Industries, Inc.,* Cr. No. 83–00159 (S–2) (E.D.N.Y.), 2097–98), and that the indictment alleged there were two aspects to the bid-rigging scheme:

> One, that the scheme to defraud these agencies was through bid collusion and the concealment of material facts relating to the bid collusion, and,
>
> Two, a scheme to obtain money by means of false and fraudulent repr[e]sentations that no bid collusion occurred in connection with the letting of the contracts.
>
> Such a plan or cause of action involving either or both of these aspects, would constitute a scheme or artifice within the meaning of the statute.
>
> It is not necessary that the Government prove all of the details alleged in the indictment concerning the precise nature, purpose, object, goal and means of achieving the scheme or that the alleged scheme actually succeeded in defrauding someone.
>
> In order to find the existence of the unlawful scheme, you need only find—and that means the Government prove [*sic*] beyond a reasonable doubt—that there existed a common plan to defraud involving bid collusion as I have previously explained in these instructions, including either the concealment of material facts or the making of false or fraudulent representations relating to the bid collusion.

(*Id.* at 2096–97.) These instructions made it clear that bid rigging was an integral part of each aspect of the mail fraud

schemes alleged, for neither aspect could be established without there having been bidding collusion. Indeed, this Court in affirming the judgments of conviction of Lizza and Hochreiter stated that "[t]he proof at trial showed that Lizza Industries, a major Long Island construction firm, and Herbert Hochreiter, Lizza's president and part-owner, were active participants in a large bid-rigging conspiracy. The conspirators colluded on the bidding of four publicly funded contracts for the repair and building of public roads and highways on Long Island." *United States v. Lizza Industries, Inc.*, 775 F.2d at 494.

In sum, the indictment, the evidence, the charge, and the affirming opinion of this Court warranted the determination by Judge Mishler that the judgments of conviction against Lizza and Hochreiter necessarily determined that those defendants had participated in a conspiracy to rig bids on the Shelter Island and materials contracts. Appellants may not properly complain that the trial court allowed the use of those convictions against those defendants as prima facie evidence of that participation.

There is no greater basis for the attack on the admission of the judgments convicting Pratt Inc. and Guy Pratt. The Pratt defendants pleaded guilty before Judge Mishler. He reviewed the superseding informations under which they entered their pleas, which alleged mail fraud in connection with bid rigging on the Wantagh Avenue contract as well as other fraudulent acts. The court had heard the testimony of Guy Pratt at the trial that ended in a hung jury, and had accepted the pleas of guilty on the basis of that testimony, without requiring further allocution. Judge Mishler was uniquely qualified to determine what facts were established by the Pratt defendants' guilty pleas, and appellants have presented us with no basis for disputing the determination that those pleas conceded that Pratt Inc. and Guy Pratt had engaged in bid rigging with respect to the Wantagh Avenue contract.

The recent decision of the Supreme Court in *McNally v. United States,* —— U.S. ——,

107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), invoked by appellants for the proposition that the criminal convictions at issue here were invalid, is not pertinent to the present case. In *McNally*, the Court ruled that the mail fraud statute, 18 U.S.C. § 1341, does not encompass fraudulent schemes that merely violate the "intangible right of the citizenry to good government." 107 S.Ct. at 2879. Thus, the Court overturned the convictions of Kentucky politicians who had been convicted of mail fraud for their participation in an insurance fee-splitting scheme, stating that the mail fraud statute is designed to reach fraudulent use of the mails to deprive the victims of tangible property, not merely of "the right to have the Commonwealth's affairs conducted honestly." *Id.* at 2877. The mail fraud convictions of Lizza, Hochreiter, Pratt Inc., and Guy Pratt were convictions for depriving the State and the County of money. There was no suggestion that the State or County officials had in any way acted dishonestly; to the contrary, the indictments alleged that the scheme was to defraud the agencies, not to corrupt them, and the jury was instructed accordingly.

 Finally, we find no merit in the Amfar defendants' contention that, since they had not been convicted of mail fraud and the convictions of others were to be admitted, the State's claims against them should have been tried separately and that they are entitled to a new trial because they suffered from a prejudicial spillover effect. The decision whether to grant a severance motion is committed to the sound discretion of the trial court. *See Chicago, Rock Island & Pacific Railroad Co. v. Williams,* 245 F.2d 397, 404 (8th Cir.), *cert. denied,* 355 U.S. 855, 78 S.Ct. 83, 2 L.Ed.2d 63 (1957); 1 J. Weinstein & M. Berger, *Weinstein's Evidence,* ¶ 105[01], at 105–9 (1986). We see no abuse of discretion here, where the motion for severance was first made after trial was commenced, the granting of the motion would have resulted in a second trial that would be largely identical with respect to issues and proof, and any prejudice to the Amfar defendants could be minimized by giving limiting instructions. Judge Mishler took great pains to instruct

the jury repeatedly that each judgment was admissible only against the defendant who had been convicted, that it could be used only to show his or its participation in a conspiracy with respect to the contract or contracts at issue in his or its criminal case, and that the conviction could not be used against any other defendant for any purpose whatever. We see no basis for believing the jury disregarded these limiting instructions. In light of the weight of the evidence against the Amfar defendants, which was damning with respect to every aspect of the alleged conspiracies and every contract at issue in this case, the suggestion that the verdict against them was the result of prejudicial spillover is entirely frivolous.

### D. The Statute-of-Limitations Defense

Section 4B of the Clayton Act provides that "[a]ny action to enforce any cause of action under [the antitrust laws] shall be forever barred unless commenced within four years after the cause of action accrued." 15 U.S.C. § 15b. The present lawsuit was commenced on June 16, 1983; the State's causes of action accrued prior to June 16, 1979, since the latest of the contracts at issue in the present case was awarded prior to that date. In order to escape the statutory time bar, the State sought to show that defendants had fraudulently concealed the State's claims from it, thereby tolling the statute of limitations until the State's discovery of the claims. Hendrickson and Lizza contend that they were entitled to judgment dismissing the State's claims because the State, which adduced no proof of any affirmative acts of concealment by them, as contrasted with such acts by the Amfar defendants, failed to establish fraudulent concealment by Hendrickson and Lizza. We disagree because the record adequately established fraudulent concealment by all defendants and because the jury was entitled to find that the affirmative acts of concealment by Amfar were attributable to the other defendants as well.

As described by the Supreme Court more than a century ago, the pur-

pose of the fraudulent-concealment doctrine is to prevent a defendant from "concealing a fraud, or ... committing a fraud in a manner that it concealed itself until such time as the party committing the fraud could plead the statute of limitations to protect it." *Bailey v. Glover*, 88 U.S. (21 Wall.) 342, 349, 22 L.Ed. 636 (1874). Describing the elements of this equitable doctrine, the Court stated that

> wh :n there has been no negligence or laches on the part of a plaintiff in coming to the knowledge of the fraud which is the foundation of the suit, and when the fraud has been concealed, or is of such character as to conceal itself, the statute does not begin to run until the fraud is discovered by, or becomes known to, the party suing, or those in privity with him.

*Id.* at 349–50. Thus, we have held that an antitrust plaintiff may prove fraudulent concealment sufficient to toll the running of the statute of limitations if he establishes (1) that the defendant concealed from him the existence of his cause of action, (2) that he remained in ignorance of that cause of action until some point within four years of the commencement of his action, and (3) that his continuing ignorance was not attributable to lack of diligence on his part. *E.g., City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 460 (2d Cir.1974); *see Baskin v. Hawley*, 807 F.2d 1120, 1131 (2d Cir.1986) (claim for pension benefits); *Cerbone v. International Ladies' Garment Workers' Union*, 768 F.2d 45, 48 (2d Cir.1985) (employment discrimination claim).

As indicated in *Bailey v. Glover*, the plaintiff may prove the concealment element by showing either that the defendant took affirmative steps to prevent the plaintiff's discovery of his claim or injury or that the wrong itself was of such a nature as to be self-concealing. The passing off of a sham article as one that is genuine is an inherently self-concealing fraud, whether what is passed off is a fake vase sold as a real antique, *see Hobson v. Wilson*, 737 F.2d 1, 33–34 & n. 102 (D.C.Cir.1984), *cert. denied*, 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985), or a collusive bid purporting to reflect genuine competition, *see Colorado ex rel. Woodard v. Western Pav-*

*ing Construction Co.,* 833 F.2d at 881 (*"Western Paving"*). As we have discussed in Part II.A. above, a bid-rigging conspiracy is the kind of enterprise that requires a number of participants and, in order that there be adequate incentive for their participation, agreement as to a number of contracts. Thus, the enterprise is designed to endure over a period of time. In order to endure, it must remain concealed from the victim of the collusive bids. As the Tenth Circuit put it in *Western Paving,*

> [i]f a bidrigging conspiracy exists, it must remain concealed to be successful. Any knowledge of the conspiracy would lead plaintiff to seek action immediately and result in collapse of the conspiracy. Furthermore, unlike many conspiracies, a bidrigging conspiracy is likely to exist for an extended period of time. To be attractive to all bidders, the conspiracy must cover more than one job—or must provide some quid pro quo to the "losing" bidders. The very nature of a bidrigging conspiracy makes it likely that future bids will also be rigged.... These additional bidrigging activities not only provide the compensation for one of the "losing" bidders in the original bid but also help to conceal the bidrigging activity on the other bids. Such subsequent fraudulent acts may in themselves amount to affirmative acts of concealment.

*Id.*

The bid-rigging scheme at issue here fit squarely within this framework. The NYSDOT contracts conspiracy had at least six contractor members and involved contracts awarded in 1977 and 1978. Each of the four corporate defendants was awarded at least one of the contracts at issue. The members of the conspiracy that were intended to be low bidders were advised that they should limit the excess profits included in their bids to 20–25% and not approach 40–50%, presumably in order not to draw unwanted scrutiny. The submission of accommodation bids was designed in part to make the low bid appear reasonable. The bidders were required to submit affidavits representing that they had not engaged in collusion in submitting their bids, and it was obvious that discovery of the bid rigging would have defeated the enterprise. Since the primary element of a claim under § 1 of the Sherman Act is a "contract, combination ... or conspiracy," and the defendants' scheme necessarily included concealment of the existence of their conspiracy, proof of the conspiracy itself sufficed to prove concealment by the coconspirators.

We are persuaded also that the record contains sufficient evidence of affirmative acts of concealment to support the State's effort to avoid the statute of limitations. After Amfar entered into the bid-rigging scheme, Ambrosio instructed LoMonte to remove from the office the books and documents that reflected Amfar's participation in the scheme and the extra profits thereby earned. In July 1978, after LoMonte had been arrested on an unrelated matter, which resulted in the seizure of a ledger documenting Amfar's unreported cash transactions, including kickbacks to several of the coconspirators, he met with Ambrosio, Farino, and Anthony Farino to assess the situation. They discussed the documents that reflected the bid rigging and agreed that "it wouldn't be wise for any of us to talk." The Farinos suggested that the best way to get rid of the telltale documents would be to burn them. Many of the documents were thereafter burned; Amfar purchased a shredder to destroy the rest. The four men also agreed that LoMonte would give false testimony if called before a grand jury, and he did so.

While there was no evidence of affirmative acts performed by the other defendants to conceal the conspiracy, other than the inherently necessary submission of the noncollusion affidavits, the trial court properly instructed the jury that if it found that the bid-rigging conspiracy continued in existence at the time of the Amfar defendants' coverup activities, it could find that those activities were also attributable to the other members of the conspiracy. The record amply permitted the inference that both the NYSDOT contracts conspiracy and the County materials contracts conspiracy remained in existence at the time the

Amfar defendants destroyed documentary evidence and initiated the fabrication of false testimony, for these cover-up activities began in July 1978. The latest NYS-DOT contract at issue here was awarded in October 1978, and the 1979 materials contract was awarded by the County in January 1979; both were proven to have been awarded on the basis of collusive bidding. Given the continuation of the two conspiracies and the fact that secrecy was essential to their continued existence, it was entirely appropriate for the court to allow use of the Amfar defendants' actions against the other coconspirators—even if the latter did not know of the actions—since they were acts in furtherance of the conspiracies. *See, e.g., Lutwak v. United States,* 344 U.S. 604, 618, 73 S.Ct. 481, 489, 97 L.Ed. 593 (1953) (noncommunicative acts of conspirator admissible against coconspirator if relevant); *United States v. Ortiz–Rengifo,* 832 F.2d 722, 725 (2d Cir.1987) (same).

In sum, the State sufficiently proved the concealment by the defendants of the conspiracies alleged in the complaint, both because the bid-rigging was self-concealing and because the Amfar defendants' affirmative acts of concealment were properly admissible against all of the defendants.

The State also adequately proved that it remained ignorant of the existence of the NYSDOT contracts conspiracy until well after June 16, 1979, *i.e.,* a point within the four-year limitations period. Muhlig, the engineer who was in charge of reviewing all highway construction bids for NYSDOT, testified that NYSDOT assumed that the bids it received represented "a free market competitive noncollusive situation." The bidders' noncollusion certifications certainly did nothing to disturb that assumption. Muhlig first learned of the allegations of bid rigging on Long Island in April 1983, when the criminal indictment was returned. County engineer Richard J. LaValle, who was in charge of reviewing the materials contracts awarded by the County, testified that he first learned of the allegations of bid rigging with respect to the 1978 and 1979 materials contracts in the spring of 1983. FBI special agent Daniel Melore testified that he had begun an investigation of Long Island highway construction con-

tracts in February 1978. His best estimate was that he did not interview State employees and obtain documents from them until 1982 or 1983. He may have talked to County employees somewhat earlier, but his testimony indicated that the County interviews did not occur earlier than 1981. Melore testified that he did not disclose to County or State employees before April 1983 either the targets of the FBI's investigation or the fact that the subject of the investigation was bid rigging.

The trial court properly instructed the jury that the State was required to establish by a fair preponderance of the evidence that its failure to commence the action within four years of the letting of the contracts was "through no fault of its own," and that it had "exercised due diligence under all the circumstances." The court also told the jury that the State had not met its burden if it had a suspicion of collusive bidding on a single contract or any other information that should have alerted it to its claim of an overall conspiracy. We find no error in the court's instructions. The jury found that neither the State nor the County could have, by exercising due diligence, discovered the existence of the conspiracies alleged in the complaint. Since it was permissible for the jury to infer that the responsibilities of Muhlig and LaValle made it likely that they would be the first officials to become alert to the conspiracies at issue here, the jury was entitled to conclude from all the evidence that no State or County official knew of the bid rigging until 1981 at the earliest. The record provides no basis for overturning its verdict.

### E. *Other Contentions*

Appellants have made a variety of additional arguments that do not require extended discussion.

 The contention of Lizza and the Amfar defendants that the trial court erred in instructing the jury with respect to the failure of Hochreiter, Ambrosio, Farino, and Anthony Farino to testify at trial is without merit. The court noted that none of these individuals had testified on behalf of themselves or the corporate defendants, and it instructed the jury that

[i]f you find that any of the defendants who failed to appear had information on any issues in this case which were peculiarly within his or its knowledge, then you may infer from such failure to appear that had the individual testified, his testimony would be adverse to the position of that particular defendant. You cannot draw an unfavorable inference against other defendants because a particular defendant did not appear. It may only be drawn against that defendant. (Tr. 2338.) This instruction was entirely proper. *See, e.g., Interstate Circuit, Inc. v. United States,* 306 U.S. 208, 225–26, 59 S.Ct. 467, 473–74, 83 L.Ed. 610 (1939) (antitrust defendants' failure to tender the testimony of those of their officers who were in a position to know whether defendants had agreed on a course of concerted action was "itself persuasive that their testimony, if given, would have been unfavorable").

The contention of Anthony Farino that he was entitled to judgment n.o.v. because there was no evidence to connect him to the alleged conspiracies is entirely frivolous. LoMonte testified that Anthony, Amfar's treasurer, was at all times kept informed of significant developments in the bid-rigging schemes, that he attended the meeting at which Guy Pratt asked that Amfar submit an accommodation bid on the Wantagh Avenue job, and that he was a driving force behind Amfar's destruction of evidence of the bid-rigging schemes. And as indicated above, the jury was entitled to take into account Anthony's failure to testify in his own behalf and to infer from that failure that he would not have been able to testify truthfully that he had not been a member of the conspiracies. In sum, the evidence was adequate to permit a rational juror to conclude that Anthony was more likely than not a knowing participant in the alleged conspiracies.

 We reject appellants' contention that the district court had no jurisiction to assess the $100 per defendant penalties imposed under the Donnelly Act, N.Y. Gen.Bus.Law § 342–a. Although federal courts have no jurisdiction to enforce the criminal laws of the states, they do have jurisdiction to enforce state penalties that

are civil in nature. *See Milwaukee County v. M.E. White Co.,* 296 U.S. 268, 270–71, 56 S.Ct. 229, 230–31, 80 L.Ed. 220 (1935). Since New York treats the penalties under § 342–a as civil, *see People v. Elmhurst Milk & Cream Co.,* 116 Misc. 2d 140, 150–51, 455 N.Y.S.2d 473, 480–81 (Sup.Ct.Kings Co.1982), the district court had jurisdiction to impose them.

Lizza also contends that since the federal government may benefit financially from the State's recovery in this action, the jury's damage award against it was improper because it duplicated the fine and forfeiture Lizza had been ordered to pay the government in the criminal proceeding. This contention is wholly without merit since Congress plainly has the power to impose both criminal and civil sanctions for the same conduct. *E.g., United States v. $2,500 in United States Currency,* 689 F.2d 10, 12 (2d Cir.1982), *cert. denied,* 465 U.S. 1099, 104 S.Ct. 1591, 80 L.Ed.2d 123 (1984); *United States v. Professional Air Traffic Controllers Organization,* 653 F.2d 1134, 1142 (7th Cir.), *cert. denied,* 454 U.S. 1083, 102 S.Ct. 639, 70 L.Ed.2d 617 (1981).

 Finally, we reject appellants' argument that the jury's verdict on the NYSDOT contracts should be reduced by the amount the Pratt defendants paid the State in settlement of the judgment herein. An amount recovered by a plaintiff from a coconspirator in settlement of the former's antitrust claims is not deductible from the amount of damages determined by the jury, though it may be deductible from the damages award after it has been trebled. *E.g., Hydrolevel Corp. v. American Society of Mechanical Engineers, Inc.,* 635 F.2d 118, 130 (2d Cir.1980), *aff'd,* 456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982); *Burlington Industries, Inc. v. Milliken & Co.,* 690 F.2d at 391–95; *Flintkote Co. v. Lysfjord,* 246 F.2d 368, 397–98 (9th Cir.), *cert. denied,* 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957). Here, since the settlement occurred after the entry of the judgment, the Pratt defendants' payment does not require a reduction even of the treble damages awarded in the judgment. It is, of course, clear that the State is not entitled to recover an item of damage from one

defendant that it has already collected from a codefendant, *see, e.g., Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 348, 91 S.Ct. 795, 811, 28 L.Ed.2d 77 (1971); but there is no indication in the record before us that the State intends to seek collection of more than the total amount of the judgment entered in its favor. If it does attempt to do so in the future, the nonsettling defendants will be entitled to a defense of satisfaction to the extent of the Pratt defendants' settlement payment, *see Burlington Industries, Inc. v. Milliken & Co.,* 690 F.2d at 391; *Hydrolevel Corp. v. American Society of Mechanical Engineers,* 635 F.2d at 130, and may assert that defense in the district court.

We have considered all of the other arguments advanced by appellants and have found them to be without merit.

### CONCLUSION

The judgment of the district court is in all respects affirmed.